**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

------------------------------x
AMIEL DABUSH,                 :
                              :
        Plaintiff,            :
                              :
v.                            :     Case No. 3:10cv00067 (AWT)
                              :
THE GUARDIAN LIFE INSURANCE   :
COMPANY OF AMERICA,           :
                              :
        Defendant.            :
------------------------------x

## RULING ON MOTION FOR SUMMARY JUDGMENT

The plaintiff, Amiel Dabush ("Dabush") brings this complaint pro se pursuant to the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001 et seq. ("ERISA") seeking to recover disability benefits denied by defendant The Guardian Life Insurance Company of America ("Guardian"). Guardian has moved for summary judgment, arguing that its decision to deny the plaintiff benefits was not arbitrary or capricious. For the reasons set forth below, Guardian's motion is being granted.

## I.   FACTUAL BACKGROUND

The plaintiff is a software engineer and the Vice President of Digitalk, Inc. ("Digitalk"). Digitalk provides its employees, including the plaintiff, with an employee benefit plan (the "Plan") issued by Guardian. The Plan provides disability benefits under a group long-term disability ("LTD") policy, and Guardian both evaluates claims for benefits and pays benefits

1

claims.  Guardian is "the Claims Fiduciary with discretionary authority to determine eligibility for benefits and to construe the terms of the plan with respect to claims."  (Admin. Record (Doc. No. 34-1) at AR 0410.)

On March 2, 2008, the plaintiff suffered an injury which was later diagnosed as a herniated disk, which caused right leg pain and weakness.  The plaintiff met with Doctor Scott P. Sanderson ("Sanderson") regarding his injury, and decided to undergo surgery at Sanderson's recommendation.  The plaintiff's surgery, a right L4-5 hemilaminotomy and microdiskectomy, took place on April 24, 2008.

On October 21, 2008, the plaintiff had a follow-up appointment with Sanderson.  The plaintiff reported that he still experienced some achiness in his lower back with prolonged sitting, and he asked Sanderson to fill out some disability paper work for him.  Sanderson believed that the plaintiff could work an eight-hour day, but would need to make some adjustments at work so that he would not be sitting all day.  Sanderson completed the disability paperwork.

On October 30, 2008, Guardian received the plaintiff's claim for LTD benefits.  The plaintiff claimed that he was unable to perform his job because he could not tolerate sitting for a sufficient amount of time.  Guardian contacted the plaintiff and the plaintiff's general physician, Doctor Igal Staw ("Staw"),

requesting that they submit various documents pertaining to the plaintiff's eligibility for LTD benefits. On December 18, 2008, Guardian sent the plaintiff a letter informing him that Guardian had determined that LTD benefits were payable, and the first payment would cover the period from June 18, 2008 to November 17, 2008. In order to receive benefits for the period after November 17, the plaintiff was required to continue submitting medical updates from his physicians and other required documents, such as financial statements.

After receiving the payment from Guardian, the plaintiff believed that the amount he had received was incorrect. He contacted Guardian and informed it that the company had erred in making its benefits determination. Beginning on January 17, 2009, the plaintiff and his attorney contacted Guardian several times about his benefits and sent Guardian updated financial statements. The plaintiff also filed a complaint with the State of Connecticut Insurance Department's Consumer Affairs office, complaining about Guardian's overall handling of his claim. On March 17, 2009, Guardian contacted the plaintiff to tell him that it was in the process of recalculating his benefits, and on March 20, 2009, it informed him that it would be sending him an additional $22,002.20 that it owed him.

On or about March 31, 2009, the plaintiff revisited Sanderson and requested that he fill out disability forms for

him.  Sanderson determined that it was reasonable to extend the disability status and filled out the documentation.  Sanderson indicated that the plaintiff could work part-time and that he had a "slight limitation of functional capacity" and was "capable of light work."  (Admin. Record at AR 0261.)

Sometime in April, the plaintiff began experiencing more pain after driving a car for four hours without interruption.  He returned to Sanderson for treatment on April 21, 2009. Sanderson's medical records for the visits by the plaintiff on March 31 and April 21 were summarized by Guardian in correspondence to the plaintiff as follows:

> 3/31/09 visit - ". . . presents with a complaint of leg pain." "Last week he had a severe exacerbation of leg symptoms, but this time on the left side.  He drove 4 hours uninterrupted to drive his son to college, which is something he regularly would not do. Afterwards, he had severe left lower back and buttock pain with radiation to the upper posterior thigh.  He received prednisone from his primary care physician as I was away that week.  Most of these symptoms have resolved but he is somewhat concerned about new pathology." "He continues to have difficulty sitting for more than an hour and he continues to work part time and be partially disabled."  An MRI was ordered. Rx for Vicodin 5-500 MG was ordered, no refill.

> 4/21/09 visit - ". . . presents for recheck of leg pain." "He presented with an MRI of the lumbar spine from Yale New Haven Hospital.  It shows a new left L3-4 paracentral contained herniated disk with left L4 nerve root compression.  It does not show any recurrent or residual disk herniation on the right at L4-5.  This fits with his new onset of left L4 distribution pain and weakness that he had on this last visit . . . he does not have leg pain anymore, nor weakness or

4

complaints of numbness."  "Plans: Follow up as needed - routine."

(Admin. Record at AR 0261 (emphasis added).)

On the forms, dated April 21, 2009, that Sanderson submitted to Guardian regarding the plaintiff's progress and disability status, Sanderson indicated that the plaintiff was capable of sitting for three hours at a time, of standing for three hours at a time, and of walking for one hour at a time, and that he was capable of light work.  A patient who is cleared for "light work" is capable of "[l]ifting 20 pounds occasionally maximum with frequent lifting and/or carrying up to 10 pounds.  A job would also be in this category if it involved minimal weight but frequent standing and/or walking; or repetitive use of push/pull arm controls or leg controls."  (Admin. Record at AR 0124.)

In response to Sanderson's evaluation, Guardian provided Sanderson with information about the physical requirements for the plaintiff's occupation as a software engineer.  In light of that occupational information, Guardian asked whether Sanderson believed that the plaintiff was capable of working a sedentary job for up to seven hours per day.  In a response dated April 29, 2009, Sanderson answered "yes," indicating that the plaintiff was capable of working up to seven hours at a sedentary job "as long as positional changes are possible."  (Admin. Record at AR 0225.)

The response indicated that Sanderson had seen the plaintiff on April 21, 2009.

On May 20, 2009, Guardian sent the plaintiff a letter stating it had determined that he no longer qualified for LTD payments as of April 21, 2009.  In the May 20, 2009 letter, in the first paragraph under the heading "How We Reached Our Decision," Guardian wrote:

> We received a physical capabilities evaluation form completed by Dr. Sanderson on April 21, 2009.  He advised that you are capable of sitting 3 hours at one time; standing 3 hours at one time; walking for 1 hour at a time; lifting up to 10 pounds occasionally; pushing/pulling up to 10 pounds frequently; capable for using both hands for repetitive motions never bending/stopping/ squatting/crouching/kneeling/crawling /climbing ladders; seldom climbing stairs/reaching out/ reaching above shoulders/driving; capable of light work for 7 hours a day.

(Admin. Record at AR 0209.)  Under the Plan provisions, net monthly payments end on the earliest of:

> (a) the date the employee's disability ends;
> (b) the date the employee dies;
> (c) the end of the maximum payment period;
> (d) the date the employee fails to give us any proof of disability we require;
> (e) the date the employee refuses to allow any physical exam we require;
> (f) the date the employee is no longer under the regular and continuing care of a doctor;
> (g) the date benefits end in accord with any rehabilitation provision of this plan.

(Admin. Record at AR 0395.)  The Plan further provides that an
employee's disability ends on the earliest of

> (a) the date the employee earns or we determine he  or
> she is able to earn at a rate of at least 80% of his or
> her indexed prior monthly earnings; or (b) the date we
> determine the employee is able to perform the major
> duties of his or her regular occupation or employment
> on a full-time basis, even if the employee chooses not
> to perform such duties.

(Admin. Record at AR 0394.)  Guardian's letter stated that the
plaintiff was no longer disabled, and therefore no longer
entitled to benefits, because he was able to earn at a rate of at
least 80% of his indexed prior monthly earnings.

Guardian used the following Plan provisions regarding
earnings to determine that the plaintiff was able to earn at a
rate of at least 80%:

> "Basic monthly earnings" are based on the amount of an
> employee's earnings received from the employer as
> reported to us.  These earnings are used in determining
> the amount of premiums due for the coverage and for
> projecting an employee's gross monthly benefit under
> this plan.  The types of earnings that we include as
> basic monthly earnings are shown in the schedule.

> "Prior monthly earnings" means the employee's rate of
> basic monthly earnings as last reported to us prior to
> the start of his or her disability.  An employee's
> prior monthly earnings are used in determining his or
> her gross monthly benefit under this plan.

> "Indexed prior monthly earnings" means the employee's
> rate of prior monthly earnings adjusted annually by an
> indexing factor.  An employee's indexed prior monthly
> earnings are used in determining the maximum amount of

> current monthly earnings a disabled employee can earn
> under this plan and still receive benefits. For more
> information on this plan's indexing benefit see "The
> Indexing Benefit."

(Admin. Record at AR 0403.) Based on both Sanderson's conclusion that the plaintiff was capable of light work for up to seven hours a day and the financial statements the plaintiff had submitted regarding his prior earnings, Guardian determined that the plaintiff was capable of earning at least 80% of his indexed prior monthly earnings. Therefore, he was no longer eligible for LTD benefits.

On June 2, 2009, the plaintiff sent Guardian a letter stating that Guardian had misinterpreted Sanderson's letter indicating that the plaintiff was capable of working at a sedentary job for up to seven hours per day. The plaintiff stated that he was incapable of sitting for a long time, and if he had to do so, he needed to take pain medication which affected his ability to concentrate. Because he could not work sitting, standing, lying down, walking around or on pain medication, the plaintiff believed that he was still disabled and entitled to LTD benefits.

On June 5, 2009, Guardian responded that it was treating the plaintiff's June 2, 2009 letter as an appeal of the decision to terminate his LTD payments. The letter stated, "please advise if

you intend to submit additional information for our review. Please submit any additional information by June 22, 2009 to be included in our review. . . . If you are unable to provide the requested information by June 22, 2009 and require an extension, please contact our office." (Admin. Record at AR 0206.) Guardian stated that it would begin reviewing the plaintiff's appeal after it received updated information and the plaintiff's medical history from Sanderson and Staw.

In conducting its review of the plaintiff's appeal, Guardian contacted Sanderson to clarify his previous statements about the plaintiff's capacity for work. On July 22, 2009, Sanderson responded to Guardian's request for information, stating:

> . . . I believe the patient can perform his job as a software engineer, working from home up to 7 hours a day, allowing for changes in his position to relieve back and leg symptoms.
>
> Although an 8 hour day is a typical workday I believe that because his job requires mostly sitting that he would need multiple breaks during the day to get up and walk around. Therefore during a typical 8 hour work day I believe that he would only be capable of working 7 hours.
>
> This means that he would need one hour out of every 8 hour work day to make changes in his position to get up and walk around to help alleviate lower back symptoms and right leg symptoms.
>
> I have not discussed with the patient how his medication affects his ability to work.

> I have only prescribed him Vicodin once during the
> March 31, 2009 office visit.  He was given 80 pills and
> has not required a refill from me since then.
>
> Although Vicodin can cause cloudiness of sensorium and
> inability to concentrate, those that take medication
> regularly generally do not have those symptoms.
>
> He is certainly not taking a high dose according to my
> records.
>
> He was given Vicodin for the new left-sided symptoms
> which were then resolved by the April 21, 2009 visit.
> Prior to that he had approximately 1 year of residual
> right leg symptoms for which he did not need any
> Vicodin from my office.
>
> Regarding our October 21, 200[8] discussion about
> returning to soccer and other activities, I had
> released him back to any activity that he could
> tolerate including soccer.

(Admin. Record at AR 0098.)

Guardian also reviewed the plaintiff's medical history and all previously submitted information, and conducted a pharmacy canvass to determine whether the plaintiff had refilled the Vicodin prescription given to him by Sanderson.  The results of the canvass showed that the plaintiff had not refilled the prescription.

On July 31, 2009, Guardian wrote to the plaintiff to communicate that:

> We are continuing our review of your request for
> reconsideration of our decision to decline Long Term
> Disability benefits on your claim.

As part of this reconsideration review your claim is being reviewed by one of our medical specialists. The medical specialist has not yet completed the review of your claim.

For this reason, Guardian requires an additional 45 day extension to complete our review.

We will continue to make every effort to facilitate a prompt and fair decision while keeping you informed of this process.

(Admin. Record at AR 0086.)

On September 14, 2009, after reviewing the updated documents and conducting its review, Guardian sent the plaintiff a letter denying his appeal. Guardian provided the plaintiff with the relevant plan provisions and a summary of the facts that were used in making the decision. Guardian quoted from Staw's medical records for visits during the period beginning March 28, 2008 and ending May 8, 2009 and from Sanderson's medical records for the period beginning April 14, 2008 and ending April 21, 2009. It also quoted Sanderson's July 22, 2009 response to Guardian. Guardian concluded that "[b]ased on the medical evidence in file, you are capable of performing the major duties of your regular occupation of Software Engineer 7 hours per day, or 35 hours per week." (Admin. Record at AR 0060.)

Guardian also spelled out in greater detail how it had determined that the plaintiff could earn at least 80% of his indexed prior monthly earnings.  Guardian wrote:

> Your prior monthly earnings are $8197.22 per month, or $98,366.64 per year.  Based on a 40 hour week, this figure represents an hourly wage of $47.29. 80%=$6557.78 per month, or $78,693.36 per year.
>
> If you work 7 hours per day, or 35 hours per week @ 47.29 per hour you are capable of earning $1655.15 per week, or $7172.32 per month, or $86,067.80 per year. This figure is greater than 80% of your indexed prior monthly earnings.

(Admin. Record at AR 0061.)  Therefore, Guardian again concluded that the plaintiff was not eligible for LTD benefits under the Plan provisions and stated "[t]his is Guardian's final position on this matter."  (Admin. Record at AR 0062.)  At this time, Guardian closed the administrative record regarding the plaintiff's claim.

Approximately two months later, on November 17, 2009, the plaintiff submitted to Guardian an updated letter from Sanderson. Sanderson stated that after seeing the plaintiff again, he wanted to clarify his July 22, 2009 letter regarding the plaintiff's capacity for work.  Sanderson stated that the July 22 letter had been written several months after his last encounter with the plaintiff and although the letter was written with the most up to date information he had at the time, his statements in the letter

did not appear to accurately reflect the plaintiff's capacity for work as of July 22. Based on an updated exam and the plaintiff's assertions, Sanderson wrote that he believed that the plaintiff was now

> able to work about 3 to 4 hours a day in a 12 hour workday and unfortunately he has had a worsened neurologic exam coincident with worsened back and leg symptoms. Unfortunately, his MRI and x-rays did not show a surgically treatable problem and therefore I think this is likely to be a permanent disability.

(Amiel Dabush Aff. (Doc. No. 36-1) ("Dabush Aff.") ¶ 11-14, Jan. 10, 2011 (Letter from Scott Sanderson, M.D., dated Nov. 17, 2009).) This letter was not considered by Guardian because it had already reached a final decision on the plaintiff's appeal and closed the administrative record.

## II. LEGAL STANDARD

A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law. Fed. R. Civ. P. 56(c). See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1223 (2d Cir. 1994). When ruling on a motion for summary judgment, the court may not try issues of fact, but must leave those issues to the jury. See, e.g., Anderson v. Liberty Lobby,

Inc., 477 U.S. 242, 255 (1986); Donahue v. Windsor Locks Bd. Of Fire Comm'rs, 834 F.2d 54, 58 (2d Cir. 1987).  Thus, the trial court's task is "carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them.  Its duty, in short, is confined . . . to issue-finding; it does not extend to issue-resolution."  Gallo, 22 F.3d at 1224.

When reviewing the evidence on a motion for summary judgment, the court must "assess the record in the light most favorable to the non-movant and . . . draw all inferences in its favor."  Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (quoting Delaware & Hudson Ry. Co. v. Consol. Rail Corp., 902 F.2d 174, 177 (2d Cir. 1990)).  However, the inferences drawn in favor of the non-movant must be supported by the evidence.  "[M]ere speculation and conjecture" is insufficient to defeat a motion for summary judgment.  Stern v. Trs. of Columbia Univ., 131 F.3d 305, 315 (2d Cir. 1997) (quoting Western World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d Cir. 1990)).

Because the plaintiff in this case is proceeding pro se, the court must read the plaintiff's pleadings and other documents liberally and construe them in a manner most favorable to the plaintiff.  See Burgos, 14 F.3d at 790.  Moreover, because the

process of summary judgment is "not obvious to a layman," <u>Vital</u>
<u>v. Interfaith Med. Ctr.</u>, 168 F.3d 615, 620 (2d Cir. 1999), the
district court must ensure that a <u>pro</u> <u>se</u> plaintiff understands
the nature, consequences and obligations of summary judgment, <u>see</u>
<u>id.</u> at 620-21.  Thus, the district court may itself notify the
<u>pro</u> <u>se</u> plaintiff as to the nature of summary judgment; the court
may find that the opposing party's memoranda in support of
summary judgment provide adequate notice; or the court may
determine, based on thorough review of the record, that the <u>pro</u>
<u>se</u> plaintiff understands the nature, consequences, and
obligations of summary judgment.  <u>See</u> <u>id.</u>

     After reviewing the defendants' memorandum in support of
summary judgment and the plaintiff's submissions in opposition to
summary judgment in this case, the court concludes that the
plaintiff understands the nature, consequences and obligations of
summary judgment.  First, the defendant served the plaintiff with
the notice to <u>pro</u> <u>se</u> litigants required by Local Rule 56(b).
Second, the defendants' memorandum states the nature and
consequences of summary judgment.  Third, the plaintiff submitted
a complete response to the defendants' motion which indicates
that he understands summary judgment.  The plaintiff's opposition

contains argument in opposition to each of the defendant's contentions and includes an affidavit and numerous exhibits.

## III. DISCUSSION

### A.  Standard of Review

"ERISA does not set out the applicable standard of review for actions challenging benefit eligibility determinations." Zuckerbrod v. Phoenix Mut. Life Ins. Co., 78 F.3d 46, 49 (2d Cir. 1996).  The Supreme Court looked to principles of trust law for guidance regarding the applicable standard of review and held that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."  Firestone Tire and Rubber v. Bruch, 489 U.S. 101, 115 (1989).  Where "written plan documents confer upon a plan administrator the discretionary authority to determine eligibility, we will not disturb the administrator's ultimate conclusion unless it is 'arbitrary and capricious.'"  Pagan v. NYNEX Pension Plan, 52 F.3d 438, 441 (2d Cir. 1995).

"In determining whether plan administrators have been granted discretionary authority, courts focus on the breadth of the administrators' power – their authority to determine

eligibility for benefits or to construe the terms of the plan."

Pretty v. The Prudential Ins. Co. of Am., 696 F. Supp. 2d 170,

180 (D. Conn. 2010) (internal quotation marks omitted).  Although

> no one word or phrase must always be used to confer
> discretionary authority, the administrator's burden to
> demonstrate insulation from de novo review requires
> either language stating that the award of benefits is
> within the discretion of the plan administrator or
> language that is plainly the functional equivalent of
> such wording.

Kinstler v. First Reliance Standard Life Ins. Co., 181 F.3d

243, 252 (2d Cir. 1999).

"If a benefit plan gives discretion to an administrator or

fiduciary who is operating under a conflict of interest, that

conflict must be weighed as a facto[r] in determining whether

there is an abuse of discretion." Firestone, 489 U.S. at 115.

Where a plan administrator both evaluates claims for benefits and

pays benefits claims, a conflict of interest exists.  See Metro.

Life Ins. Co. v. Glenn, 554 U.S. 105, 112 (2008).  When weighing

different considerations regarding the lawfulness of benefit

denials, a conflict of interest

> should prove more important (perhaps of great
> importance) where circumstances suggest a higher
> likelihood that it affected the benefits decision,
> including, but not limited to, cases where an insurance
> company administrator has a history of biased claims
> administration. . . .  It should prove less important
> (perhaps to a vanishing point) where the administrator
> has taken active steps to reduce potential bias and to

> promote accuracy, for example, by walling off claims
> administrators from those interested in firm finances,
> or by imposing management checks that penalize
> inaccurate decisionmaking irrespective of whom the
> inaccuracy benefits.

Glenn, 554 U.S. at 117.  A conflict of interest "will weigh as a

factor in determining whether there was an abuse of discretion,

but it does not make de novo review appropriate."  Hobson v.

Metro. Life Ins. Co., 574 F.3d 75, 82-83 (2d Cir. 2009).  "This

is true even where the plaintiff shows that the conflict of

interest affected the choice of a reasonable interpretation."

McCauley v. First Unum Life Ins. Co., 551 F.3d 126, 133 (2d Cir.

2008).

     In this case, the Plan explicitly provides that, as the

Claims Fiduciary, Guardian has the "discretionary authority to

determine eligibility for benefits and to construe the terms of

the plan with respect to claims."  (Admin. Record at AR 0410.)

Because this language clearly grants Guardian discretion to

determine eligibility for benefits, the decision to terminate the

plaintiff's LTD benefits is subject to the arbitrary and

capricious standard of review.

     As Guardian both determines eligibility for benefits and

pays benefits claims, Guardian is operating under a conflict of

interest.  While this does not change the standard of review to

de novo, it does weigh as a factor in determining whether Guardian abused its discretion. The plaintiff has not specifically alleged that or provided facts to suggest that Guardian has a history of biased claims administration. However, his correspondence with Guardian and the issues the plaintiff had to address in collecting the June 18, 2008 to November 17, 2008 LTD benefits could be construed as evidence of a history of biased claims administration. Additionally, Guardian has not produced evidence that it has taken active steps to reduce potential bias and to promote accuracy. Therefore, Guardian's conflict of interest will weigh more heavily when assessing whether Guardian acted in an arbitrary and capricious manner in terminating the plaintiff's LTD benefits.

**B.   Review of Guardian's Decision to Deny LTD Benefits**

An administrator's conclusion will not be deemed arbitrary and capricious unless it is "without reason, unsupported by substantial evidence or erroneous as a matter of law." Pagan, 52 F.3d at 442. "Substantial evidence is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the administrator and requires more than a scintilla but less than a preponderance." Durakovic v. Bldg. Serv. 32 BJ Pension Fund, 609 F.3d 133, 141 (2d Cir. 2010)

(internal quotation marks omitted).  "Where both the plan
administrator and a spurned claimant offer rational, though
conflicting, interpretations of plan provisions, the
administrator's interpretations must be allowed to control."
McCauley, 551 F.3d at 132.

The bases for Guardian's termination of the plaintiff's LTD
benefits and denial of the plaintiff's appeal of that termination
were set out in the letters from Guardian to the plaintiff dated
May 20, 2009 and September 14, 2009, respectively.  Both letters
cited the relevant Plan provisions and reliance on reports by
Sanderson indicating that the plaintiff was able to work up to
seven hours per day.

Guardian's reliance on the plaintiff's treating physician's
opinion regarding the plaintiff's capacity for work was neither
arbitrary nor capricious.  After receiving the first report from
Sanderson stating that the plaintiff was capable of sitting for
three hours at a time, standing for three hours at a time, and
walking for one hour at a time, Guardian sent Sanderson
information about the physical requirements of the plaintiff's
occupation.  Based on a review of that information, Sanderson
unequivocally stated that the plaintiff was capable of working a
sedentary job for up to seven hours out of an eight-hour day as

20

long as positional changes were possible. Because the plaintiff worked from home, Guardian reasonably concluded that the plaintiff would be able to make the necessary positional changes.

The plaintiff stated in his appeal that he could not sit for a sufficient amount of time to do his job, and he could not work standing, lying down, walking around or on pain medication. The plaintiff also stated that Guardian had misinterpreted Sanderson's letter. Therefore, after receiving the appeal, Guardian again requested information from Sanderson regarding the plaintiff's ability to work. Sanderson wrote that he believed the plaintiff was able to work in a sitting position for seven hours a day so long as he could take multiple breaks to walk around. He also wrote that he had not discussed with the plaintiff how Vidocin affected his ability to work, but observed that the plaintiff was not taking a high dose. His additional comments suggested that the Vicodin that he had prescribed should not have a significant impact on the plaintiff's ability to perform his job. Guardian subsequently performed the pharmacy canvass, and the results showed that the plaintiff had not refilled the prescription for Vicodin.

Based on the information provided by Sanderson prior to both the original termination of benefits and the denial of the

plaintiff's appeal, it was reasonable for Guardian to conclude that the plaintiff was capable of performing his job as a software engineer for up to seven hours a day. Because the plaintiff could work for seven hours out of an eight hour work day, under the Plan provisions, the plaintiff could earn at least 80% of his indexed prior monthly earnings and was no longer disabled.

While the court must consider the fact that Guardian was operating under a conflict of interest, there is no indication that the conflict of interest affected Guardian's interpretation of the Plan provisions or its evaluation of the evidence as to whether the plaintiff was disabled. The decisions to terminate benefits and to deny the plaintiff's appeal involved little in the way of discretionary analysis by Guardian. The determination that the plaintiff could work for up to seven hours a day was made by the plaintiff's own physician, not an employee of Guardian. The calculation of 80% of the plaintiff's indexed prior monthly earnings was based on financial statements the plaintiff submitted. The only statements contrary to Sanderson's were the plaintiff's assertions that he could not sit for a sufficient amount of time to perform his job, and if he had to do so, he needed to take pain medication, which affected his ability

to concentrate.  Yet the plaintiff had never refilled the prescription Sanderson had given him for pain medication.  It was not unreasonable or an abuse of discretion for Guardian to put greater weight on Sanderson's repeated statements about the plaintiff's ability to work than on the plaintiff's assertions.

**C.   Sanderson's November 17, 2009 Letter**

In reviewing an administrator's termination of benefits, the decision "of whether to consider evidence from outside of the administrative record is within the discretion of the district court.  Nonetheless, the presumption is that judicial review is limited to the record in front of the claims administrator unless the district court finds good cause to consider additional evidence."  <u>Muller v. First Unum Life Ins. Co.</u>, 341 F.3d 119, 125 (2d Cir. 2003) (internal quotation marks omitted).  "[T]rial de novo on new evidence would be inconsistent with reviewing the administrator's decision about whether to grant the benefit." <u>Id.</u>

Good cause to consider information beyond the administrative record has been found to exist where the claims administrator was operating under a conflict of interest and the procedures involved in arriving at the claim determination were flawed.  <u>See</u> <u>DeFelice v. Am. Int'l Life Assurance Co. of N.Y.</u>, 112 F.3d 61, 66

(2d Cir. 1997) ("[W]here such a blatant conflict exists at the administrative level . . . courts <u>must</u> exercise fully their power to review de novo and to be substitute administrators.").  Good cause has also been found to exist where the insurer's reason for denying benefits was not stated in its notices to the claimant. <u>See</u> <u>Juliano v. Health Maint. Org. of N.J., Inc.</u>, 221 F.3d 279, 289 (2d Cir. 2000) ("As a result of the failure of USH to state that absence of 'medical necessity' was a reason for the denial of benefits . . . the district court acted well within its discretion in admitting additional evidence on that issue."). Conversely, good cause did not exist where an insurer gave the claimant "ample time to submit additional materials."  <u>Muller</u>, 341 F.3d at 125.

Here, there is not good cause to consider Sanderson's November 17, 2009 letter in determining whether Guardian abused its discretion in terminating the plaintiff's LTD benefits or in denying his appeal.  When Guardian informed the plaintiff in its May 20, 2009 letter that it had determined he was no longer disabled, Guardian explicitly stated that the basis for its determination was Sanderson's evaluation form stating, <u>inter</u> <u>alia</u>, that the plaintiff was capable of working seven hours per day.  This letter gave the plaintiff proper notice of the reasons

for the denial such that he could contest Guardian's determination.

In addition, after receiving the plaintiff's appeal, Guardian informed the plaintiff that it would obtain updated medical records from his treating physicians.  Guardian asked the plaintiff to submit any documents he wished Guardian to consider by June 22, 2009, but informed him that if he could not meet that deadline, he could request an extension.

The plaintiff incorrectly asserts that Guardian's review of his claim for LTD benefits was on-going when he submitted the November 17, 2009 letter.  While the plaintiff received a letter from Guardian dated July 31, 2009 informing him that the review of his claim was continuing, that review was concluded by September 14, 2009 when Guardian wrote to the plaintiff informing him that it was denying his appeal.  The letter denying the appeal stated, "[t]his is Guardian's final position on this matter."  (Admin. Record at AR 0062.)  As this was a final determination, Guardian closed the administrative record and the review of the plaintiff's claim ended.  The plaintiff avers that the letter was submitted "shortly after Guardian told me that it was conducting an 'ongoing investigation' of my claim."  (Dabush Aff. ¶ 15.)  However, the letter was submitted approximately

three and a half months after the plaintiff was told that the investigation was ongoing and over two months after Guardian informed the plaintiff that his appeal was denied.

Because the plaintiff was put on notice of the reasons for termination of his benefits, the plaintiff had ample time to submit additional materials, and there is no evidence that the claims evaluation procedure was flawed, good cause does not exist for the court to consider Sanderson's November 17, 2009 letter which was submitted after Guardian had made its final determination on the plaintiff's appeal.

## IV. CONCLUSION

For the foregoing reasons, Guardian's decision to terminate the plaintiff's benefits and to deny his appeal was not arbitrary and capricious. Therefore, the defendant's Motion for Summary Judgment (Doc. No. 32) is hereby GRANTED. The Clerk shall enter judgment accordingly and close this case.

It is so ordered.

Dated this 15th day of August, 2011 at Hartford, Connecticut.


                                    /s/AWT
                         _____
                              Alvin W. Thompson
                         United States District Judge